# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EDWARD W. LYLE,

    Plaintiff

    v.

    Civil Action No. 1:24-cv-00128-TNM

DISTRICT OF COLUMBIA

    Defendant

## PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS
## OF THE DISTRICT OF COLUMBIA

The Plaintiff Edward W. Lyle ("Plaintiff") now submits *pro se* this opposition ("Opposition") to the February 2, 2024 motion to dismiss the Complaint ("Motion") in this proceeding filed by the Defendant District of Columbia ("District" or "D.C.").

In support of this Opposition, Plaintiff states as follows:

## I.    INTRODUCTION

In its Motion, the District never addresses the main thrust of the Plaintiff's Complaint – i.e., that the District has failed to meet requirements established under the Fourth Amendment to the U.S. Constitution for "reasonable legislative or administrative standards" to protect homeowner interests during municipal inspections of residential rental properties.  Rather, the District has thrown up various rationales for the inspections it conducted of the Plaintiff's home, all of which rationales fail to pass muster.  The District would have had a better chance of succeeding here – indeed, this proceeding might never have happened at all – if the District had given the Plaintiff a fair notice of the inspections it was going to conduct and a fair opportunity to accompany the

1

inspector during the inspection.  Whether by design or not, the District failed to do this, and the result is this lawsuit.

## II.    BACKGROUND

In the "Background" section of its brief, the District first reviews D.C. Code and D.C. Municipal Regulations concerning the operation and inspection of residential rental properties in the District.  The Plaintiff accepts that the District has Code and DCMR provisions for this purpose but notes that one of his challenges is to the adequacy of these provisions under the Fourth Amendment.  If this Court holds that these provisions are inadequate either facially or as applied under the Fourth Amendment, then any inspection that has been conducted under them is of no force and effect, and the DCMR provisions implementing those Code provisions are equally invalid.

Also in the "Background" section of its brief, the District discusses the inspection of space within a residential property that is controlled by a tenant.  Later in its brief, the District will assert its repeated contacts with the Plaintiff's tenant as justification for its inspection of the Plaintiff's entire home (the "Premises").  The Plaintiff believes there is no basis for such an assertion.

Following the "Background" section of its brief, the District turns to a recitation of facts pertaining to the two inspections of the Premises that were prompted by the complaints of the tenant.  Regarding the first inspection, the District notes that its Department of Buildings ("DOB") notified the Plaintiff that its inspector would be arriving on March 3, 2023, but then DOB  changed the inspection day and time.  The District admits that, while it notified the Plaintiff's tenant of this change, it did not notify the Plaintiff.   Thus the District did not give the Plaintiff timely notice of the inspection.

Next, the District states that the "Plaintiff does not allege that the inspector entered any portion of the residential property that was not under the control of the tenant." This is absurd. As the District states, the inspection was "of the first floor and portions of the second floor." Since the Complaint alleges – accurately - that the tenant was renting only a bedroom in the house, most of the space being inspected was "not under the control of the tenant." Indeed, the violation found by the inspector was in the dining room of the house, which was not under the control of the tenant. For the District to now assert that the Plaintiff failed to allege that the inspector entered space that was not under control of the tenant simply demonstrates that the District is grasping at straws to mount a defense to the Plaintiff's Complaint. This will be seen again and again in the District's brief.

Next, the District notes that DOB's inspector found a violation and issued a Notice of Infraction, and an administrative law judge ultimately fined the Plaintiff $4,716.00 for the violation. The District fails to note that Plaintiff had a family emergency that day, called in to attempt to reschedule the hearing, but it went forward anyway in his absence. As will be discussed further below, the Plaintiff believed at the time that the inspection had been unconstitutional and was later advised by a DOB attorney, Chris Haresign, that any constitutional challenge had to be brought in the courts and not through an administrative hearing. So the Plaintiff filed this action in court rather than pursuing an administrative appeal.

The District next reviews the second inspection of the Plaintiff's property, again based on a complaint by the Plaintiff's tenant. Again, DOB scheduled an inspection and did not show up. When the Plaintiff called DOB to learn when the revised inspection would be held, the Plaintiff was given a date, and on that date DOB again did not appear. DOB instead came the next day

without any notice to the Plaintiff.  In its brief, DOB admits again that it did not inform the Plaintiff when it changed the inspection date twice before coming to the Plaintiff's house.

Here and in other places in the District's brief, the District makes much of the fact that the Plaintiff was in the Premises during both inspections.  The Plaintiff was indeed in his basement office in the Premises when both inspections took place, and the Plaintiff had no knowledge of those inspections.  His tenant knew that the Plaintiff often could be found during the day in his basement office, but neither the tenant nor the DOB inspector bothered to check to see if the Plaintiff was there.

### III.    ARGUMENT

**A. The Plaintiff Has Adequately Alleged the Constitutional Infirmity of the District's Statute and Regulations Governing the Inspection of Residential Rental Properties.**

In the Argument section of its brief, the District first asserts that the Plaintiff was alleging a Fourth Amendment violation "either because [the District] failed to seek an administrative search warrant, or because the Plaintiff did not accompany the inspector during the inspection."  The Plaintiff, however, has not alleged – and does not allege now – that the District was required to obtain an administrative search warrant to search the Premises.  The Plaintiff is not challenging the District's authority to conduct a warrantless search in connection with its two inspections of the Premises.  At no time, furthermore, did the Plaintiff physically bar DOB's inspector from entering his home, if only because the Plaintiff never new the inspector was at his front door.

The District next introduces the principal basis for its defense against the Plaintiff's Fourth Amendment claim: i.e., that "consent makes a search reasonable" and that the Plaintiff, as a matter of law, gave such consent in obtaining a license to rent rooms in his home.  The District quotes extensively from *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523 (1967) about the reasonableness of administrative searches without a warrant.  The District, however, does not mention *Camara's*

4

insistence on "reasonable legislative or administrative standards for conducting an area inspection" that must be in place to protect a property owner's interests in the absence of a search warrant. *Camara,* at 538. The District also quotes *See v. Seattle,* 387 U.S. 541, 542, 545-46 (1967) as endorsing the reasonableness of administrative searches in regulated activities where implied consent to inspection has been given, and also *S.D. v. Neville,* 459 U.S. 553, 559-60 (1983), a case involving blood alcohol tests for drivers and thus largely irrelevant to the issues in this matter.

The District says not a word, however, about a Supreme Court case that came 14 years after *Camara* and *See* and that is discussed extensively in the Plaintiff's Complaint: i.e., *Donovan v. Dewey,* 452 U.S. 594, 598, 69 L.Ed. 2d 262, 101 S.Ct. 2534 (1981). In *Donovan,* the Supreme Court discussed *Camara*'s requirement for adequate legislative or administrative standards for conducting inspections even of regulated properties. The Court reviewed approvingly the protections afforded under the Federal Mine Safety and Health Act ("FMSHA") that included advance notice of inspections to mine owners and operators, an opportunity for pre-inspection judicial review, the right of mine operators to accompany inspectors during inspections, and pre- and post-inspection conferences with the inspector. The Court approved these measures even while noting that the mining industry had historically been one of the most heavily regulated activities in the U.S. [1]

As the Plaintiff has argued in his Complaint, he is entitled to timely notice of an inspection of his rental property and an opportunity to accompany the inspector during the inspection.[2] With

---

[1] See also the Supreme Court's mention of the need to inform property owners of the "scope and objects" of a regulatory search, "beyond which limits the inspector is not expected to proceed." *Marshall v. Barlow's, 436 U.S. 307, 323 (1978).*

[2] A point of clarification here: Nowhere in his Complaint has the Plaintiff asserted that <u>unannounced</u> warrantless inspections are unlawful or that inspections without the Plaintiff being present are unlawful.

this in mind, the Plaintiff has compared the measures in the FMSHA to protect the interests of property owners with those in the D.C. statute and regulations under which the Plaintiff's home was inspected.  Basically, there is no comparison because the District's authorities contain <u>no</u> such protections for property owners. They are as Constitutionally inadequate as they can possibly be.

In addition to its Constitutional arguments, the District also asserts that the Plaintiff's tenant consented to both inspections <u>of the Plaintiff's entire home</u> – as opposed to the space where the tenant had exclusive control - without providing any evidence that the tenant was authorized to give such consent on behalf of the Plaintiff.  As stated in Plaintiff's Complaint, the tenant in this instance had no such authority.

From its arguments in this section of its brief, the District would have this Court believe that when the Plaintiff obtained a license to rent bedrooms in his house, he consented to have inspectors wander alone anywhere in his house, open bedroom doors when private activities may be going on behind them, learn details of the Plaintiff's business or personal activities, and possibly steal or damage his personal property without a trace.  This homeowner gave no such consent. The District's statutory and regulatory authorities, however, do absolutely nothing to prevent these kinds of things from happening when an inspector arrives and the owner is not notified.

---

Plaintiff's insistence on adequate notice of inspections is merely that a reasonable attempt must be made by an inspector to locate the property owner either before or upon arrival and allow him to be present during the inspection.  If the property owner or manager is not present at the time of the inspection, the inspection should be allowed to go forward without him subject to the kinds of administrative controls that a judge would require for a warrant inspection.

**B.      The Plaintiff Has Adequately Pled A Violation of His Fifth and Fourteenth Amendment Rights.**

In this section of its Argument, the District first challenges the Plaintiff's claim that he was not given timely notice of DOB's inspections.  The District argues that neither the Constitution nor D.C. law provide a right to timely notice of inspections and thus the Plaintiff's procedural argument fails.

The Plaintiff agrees that D.C. law does not currently provide such a right.  Indeed, D.C. law presently provides virtually no rights to owners of residential rental properties when regulatory inspections occur.  The District's argument, however, begs the question of whether the owner of a residential rental property should be deemed to have a Constitutional right to timely notice of inspections and a right to be present at inspections.  The answer is yes.  These rights should deemed part of the "reasonable legislative or administrative standards for conducting an area inspection" that Supreme Court caselaw requires.

Next, the District argues that, even if the Plaintiff had such a right, the District did in fact notify him of both inspections of his home.  And even if DOB had provided no notice, the Plaintiff would have had such notice "by virtue of his licensure."

It takes considerable *chutzpah* for the District to make these arguments.  The District did notify the Plaintiff of both inspections, yes, but the District then changed the dates of those inspections repeatedly and then arrived and conducted the inspections with the Plaintiff's tenant and without any attempt to find the Plaintiff.  And the occasion when the Plaintiff obtained his rental license years ago also did not inform the Plaintiff of the date and time when the inspector was going to arrive at his home for the inspections in question.

The District's failure to give the Plaintiff timely notice of inspection was particularly egregious during its first inspection of the Plaintiff's home.   The Plaintiff had waited for the

inspector with temperature gun in hand at the time DOB set for the inspection, but the inspector did not come.  Unbeknownst to the Plaintiff, the inspector came at another time and was allowed in by the tenant, who showed him to the Plaintiff's dining room.  There the inspector took a reading with a temperature gun that showed the temperature to be two degrees below that required.  For that, the Plaintiff was fined nearly $5,000.  Not being timely notified of the inspection, the Plaintiff did not have an opportunity to accompany the inspector and take readings with his own temperature gun, which might have shown a different result. The possibility of a different result was very real because a temperature gun measures the temperature of the object on which its laser is pointed.  Exhibit 1.   If the inspector's reading was taken by pointing his temperature gun on an external window in the cold of winter, for instance, the reading likely would fail to meet the required temperature level in the room.  But a temperature gun reading on an interior wall at the same time in the same room might have shown conformance with the standard.  The Plaintiff was prevented from exploring this possibility during the inspection because the Plaintiff was not given timely notice of the inspection.

Next, the District argues that whether DOB's notice was accurate does not matter because DOB gave timely notice to the Plaintiff's <u>tenant</u> of when the inspections would occur, and the tenant consented to both inspections.  The District, however, cites no legal authority for its implied proposition that tenants in rental properties are authorized agents for the owners of those properties for purposes of regulatory inspections.

Next, the District argues that the Plaintiff could have pursued his Constitutional arguments in D.C.'s Office of Administrative Hearings ("OAH") on DOB's notice of infractions.  The District, however, has provided no authority that administrative forums are empowered to interpret

8

constitutional provisions.  Indeed, they are not.  As the D.C. Court of Appeals has said indirectly

by quoting approvingly the New Jersey Supreme Court:

> [A]dministrative agencies cannot be equated with judicial courts. An administrative agency
> is not simply a neutral forum whose function is solely to decide the controversy presented
> to it.  Administrative agencies belong to a different branch of government. They are
> separately created and exercise executive power in administering legislative authority
> selectively delegated to them by statute. . . . [T]he adjudicative functions of administrative
> agencies are actually an aspect of their regulatory powers and, in essence, do not embrace
> or constitute the exercise of judicial authority. Courts, by contrast, are constitutionally-
> founded, independent and impartial adjudicative tribunals constituted to hold and exercise
> the judicial power which emanates directly from the Constitution. . . . Consequently,
> procedures and techniques developed to handle the operation and business of the courts
> may not be transported [i]n toto or imported wholesale into administrative agencies.
> (emphasis added)

*AFGE Nat'l Office v. D.C. Pub. Emple. Rels. Bd.*, 237 A.3d 81, 88 (D.C. 2020) (quoting from

*Hackensack v. Winner,* 88 N.J. 1, 28 [N.J.1980].

## B.  The Plaintiff Has Adequately Alleged Harm Caused by a District of Columbia Policy or Custom.

In the last section of its Argument, the District claims that the Plaintiff "has failed to allege

that any violation was caused by a municipal policy or custom of the District."  Here the District

cites 42 U.S.C. § 1983, under which "municipalities can be held liable for constitutional violations

by their employees only if a plaintiff shows that an 'official municipal policy of some nature

caused a constitutional tort."  The D.C. Circuit has established four ways in which a municipality

may be held liable for the actions of its employee.  *Hurd v. District of Columbia,* 997 F.3d 332, 337

(D.C. Cir. 2021).  The first of those ways is that "the municipality adopts a policy that violates the

Constitution."  That is exactly what the District has done here.  It has adopted a policy of allowing

residential rental properties to be inspected without, in the words of *Camara,* "the "reasonable

legislative or administrative standards for conducting an area Inspection" that the Constitution

requires.

9

Next, the District argues that the Plaintiff has "failed to allege that the District provided inaccurate notices due to a *District policy.*" True, the Plaintiff is not addressing whether the District's inaccurate notices to him were caused by a District policy or not. The Plaintiff is also not alleging, as the District also contends, that "a District employee made a mistake when providing notice of the inspections." And the Plaintiff is not alleging, as the District further contends, that he received ineffective notice of the inspection due to a particular District custom. Rather, the Plaintiff is arguing that the District has adopted a policy of not requiring, through legislation or regulation, timely notices of inspection to owners of residential real estate and their right to be present during inspections, all to the extent reasonably possible.

Put conversely, the Plaintiff is arguing that the failure of the District to require certain things – i.e., timely notice of residential rental inspections to homeowners and an opportunity to accompany inspectors during inspections, to the extent reasonably possible – violates the Constitution, regardless of what any 42 U.S.C. § 1983 or any other federal or District statute, regulation or any other authority may require.

Next, DOB argues that Plaintiff has nothing to complain about because DOB in fact "ha[d] a custom of providing notice of a specific date and time to the landlord of a housing business." The District then argues that this custom, when coupled with the fact that the Plaintiff's <u>tenant</u> was given timely notice of the inspection, "provides more notice than is constitutionally required."

Whether or not DOB had a policy of providing notice of a particular date and time to the landlord, that policy was worthless in this instance because, whether by design or not, DOB constantly changed its arrival time without notice to the Plaintiff. And the fact that DOB always gave timely notice to the <u>tenant</u> of the inspector's arrival was meaningless unless the tenant was the authorized agent of the landlord, which she certainly was not.

Finally, the District argues that there is nothing in the Plaintiff's Complaint demonstrating the District's "deliberate indifference" to the risk of constitutional violations. To the contrary, DOB's practice of telling the Plaintiff one arrival time and then showing up unannounced to him at another time is at least a prima facie case of deliberate indifference to the Plaintiff's constitutional rights under the caselaw cited in his Complaint. Also, as noted above, "deliberate indifference" is only one the four ways that a municipality may be held liable under 42 U.S.C. § 1983, and the Plaintiff has already cited above another of whose ways – i.e., adopting a policy that violates the Constitution – upon which the District may in this instance be held responsible under that statute.

Here too, the District's arguments fail.

## IV.      CONCLUSION

For the reasons stated above, the District's arguments have no merit, and this Court should now deny the District's Motion to Dismiss.


Respectfully submitted,

*/s/ Edward W. Lyle*

Edward W. Lyle, *pro se*
1250 Connecticut Avenue N.W.
Washington D.C. 20036-2657
Tel:  (202) 333-4280
Fax: (202) 333-4282
Email:  *ewlyle@west1805.com*

February 16, 2024

11

# EXHIBIT 1

Case 1:24-cv-00128-TNM   Document 10   Filed 02/16/24   Page 13 of 25

# Science**ABC**

Q

Phys

Che

Biolc

Engi

Matł

Soci
Scie

Vide

Abo
Us

Home   »   Technology

# How Does A Temperature Gun (Infrared Thermometer) Work?

**Written By Piyush Patel**   Last Updated On: 19 Oct 2023       Published On: 13 May 2020

▶ Table of Contents (click to expand)

> *A temperature gun—a type of infrared thermometer—works by measuring the amount of infrared radiation emitted by an object. The emitted IR radiation is focused onto a thermopile using a lens; the thermopile then converts thermal energy into electrical energy, and finally, these electrical signals are used to determine the temperature of the body.*

If you were to head outside right now (though in most parts of the world, you really shouldn't), chances are high that you will be held at gunpoint. Don't worry, contrary to other times, this gun might help you survive!

A temperature gun, also known as a laser or non-contact thermometer, is an infrared thermometer that measures the temperature of an object from a certain distance. Originally meant to measure the temperature of moving objects and inaccessible surfaces, temperature guns have found

*Science***ABC**

Phy

Che

Biol

Engi

Matl

Soci
Scie

Vide

Abo
Us

ubiquitous.



Temperature guns allow for faster and more secure temperature checks. (Photo Credit : JETACOM

AUTOFOCUS/Shutterstock)

Temperature guns are being utilized at airports to screen passengers, by shopkeepers to check incoming customers, in driveways, and every other possible area, but how do these guns work? Aren't we supposed to stick a thermometer under our armpits or insert it beneath our tongues to measure our body temperature?

Well, not anymore!

**Recommended Video for you:**

Case 1:24-cv-00128-TNM    Document 10    Filed 02/16/24    Page 15 of 25

*Science***ABC**

Phys

Che

Biolc

Engi

Matl

Soci
Scie

What is Blackbody Radiation: Explained in Simple Terms

Vide

Abo
Us

# Black Body Radiation

Infrared thermometers take advantage of the fact that all objects, including humans, at a temperature above absolute zero, emit heat in the form of thermal radiation. This is a concept known as black body radiation.

*Science* **ABC**                                                      🔍   Phy:

                                                                            Che

                                                                            Biol

                                                                            Engi

                                                                            Matl

                                                                            Soci
                                                                            Scie

                                                                            Vide

                                                                            Abo
                                                                            Us

Fahrenheit) is the lowest possible temperature an object can attain—and also a point where atoms exhibit strange and exotic behavior. However, at any temperature above absolute zero, atoms are in a constant state of motion and possess kinetic energy. The higher the temperature, the more kinetic energy the atoms/molecules possess. When the electrons in these excited atoms jump from one orbit (energy state) to another or when two excited molecules collide, energy in the form of electromagnetic radiation is emitted. This kind of electromagnetic radiation, emitted solely by the kinetic energy and movement of particles in matter, is classified as **thermal radiation.**

Being a subset of electromagnetic radiation, thermal radiation comprise more than a single wavelength. It includes radio waves, infrared waves, and visible light. The type of thermal radiation emitted depends on the source temperature. As mentioned earlier, the higher the temperature, the faster the molecules move, so the greater the amount of radiation emitted. At high enough temperatures, objects start radiating visible light.

The sun, for example, resides at a temperature close to 5,600 Celsius and emits most of its thermal radiation as visible light. Humans and all animals, on the other hand, emit infrared radiation that lies just beneath visible light in the electromagnetic spectrum.

*Science* **ABC**

Phys

Che

Biol

Engi

Matl

Soci
Scie

Vide

Abor
Us



A thermal map of the human body created based on infrared radiation. (Photo Credit : PATARA/

Shutterstock)

# Stefan-Boltzmann Law

The knowledge of infrared radiation being emitted by humans and
animals has mostly been employed for thermal imaging. An infrared
thermometer takes this a step further and puts a number to the amount
of thermal radiation given off. IR thermometers do this by employing the
Stefan-Boltzmann law.

*Science***ABC**    🔍    Phys

Che

Biol

unit time by a black body is proportional to the fourth power of its absolute temperature'.

Mathematically,

$$E \propto T^4$$

Eng

Matl

Here, E is the radiant energy emitted per unit area per unit time and T is the absolute temperature of the object.

Soci
Scie

Upon removing the sign of proportionality, a constant term known as the Stefan–Boltzmann constant ($\sigma = 5.67 \times 10^{-8}$ Wm$^{-2}$K$^{-4}$) gets added to the formula.

Vide

$$E = \sigma T^4$$

Abo
Us

The above equation relates radiant energy to the temperature of a black body, a body/object that absorbs all radiation incident at it. However, a perfect black body doesn't exist yet (although Vantablack comes pretty close), so the above equation must be adjusted for all other regular objects.

$$E = e\sigma T^4$$

The formula is modified by adding a term called emissivity (e). This is the ratio of radiant energy emitted by a regular surface to the radiant energy emitted by a black body surface at the same temperature. Emissivity values range from 0 to 1. An emissivity of 1 represents a perfect black body and 0 represents a perfect reflector. Human skin has an emissivity value between 0.97 and 0.99! (Source)

*Science* **ABC**

Q

Phys

Che

Biol

Engi

Math

Soci
Scie

Vide

Abou
Us

# How A Temperature Gun Works

A typical infrared thermometer has the following parts—a laser, a converging lens, an IR sensor (thermopile), an ambient/reference temperature sensor, an amplifier, and other electronic components to convert and display the results in numeric values.



Components of an infrared thermometer

When you point the temperature gun at something or someone and shoot, a laser is discharged from the thermometer. The laser, however, doesn't have any functional use, nor is it the thing that actually

# Science**ABC**

🔍    Phys

Che

Biolo

Engi

Math

Soci
Scie

Vide

Abo
Us

pin-point aim at the object to be measured.

Infrared radiation, like visible light, can be reflected, absorbed, and concentrated. Thus, IR radiation emitted by an object or a human is first focused onto the thermopile inside the temperature gun using a converging (convex) lens. Next is a thermopile, an electronic device that converts thermal energy into electrical energy. The thermopile is made by stacking several thermocouples in either a series or parallel configuration.

The temperature of the thermopile increases with the amount of radiation incident on it. However, the opposite side (the one facing the other side of the gun) of the thermopile stays at a slightly lower temperature, as infrared radiation is not directly incident on it. This difference in temperature leads to the development of a voltage difference, and thus electricity (thermoelectric effect). The electrical reading is then amplified using an amplifier.

Ultimately, the electrical reading is passed through to a typical data acquisition circuit and the final temperature reading is displayed on an LED panel in Celsius or Kelvin.

An ambient sensor present near the thermopile helps compensate for any thermal radiation entering the temperature gun from the atmosphere itself.

An optical chopper is another component that is often incorporated in temperature guns. An electric motor drives the optical chopper and helps the thermopile receive radiation on two different wavelengths. They also consist of various emissivity settings to help check the

*Science***ABC**    🔍    Phys

based on their distance-to-spot ratios (D:S) and, obviously, this number represents the ratio of the size of the spot/area being measured to the distance of the thermometer from the spot. The greater the D:S ratio, th greater the range and accuracy of the IR thermometer.

---

**Also Read: <u>What Is Blackbody Radiation?</u>**

---

# Temperature Guns Applications

A temperature gun finds extensive use in various industries. It is primarily used by firefighters to check for hot spots while extinguishing a fire, in manufacturing and electronic industries to monitor machine temperatures, the performance of heating/cooling systems, insulation systems, car engines, inspecting electric panels and other temperature-sensitive electric parts, etc. An IR thermometer can also be used to ensure food safety by monitoring heater/oven temperature and food temperature, as well as in agriculture to monitor plant and soil temperature, among other things.

The most important application of a temperature gun in recent times has been for public safety. Temperature guns allow for easier, faster, and more secure temperature checks of a greater number of people in places like airports. They have previously been employed to check travelers for fever during epidemic events like Ebola and SARS. Now, the technology is being used to verify potential cases of COVID-19.

Case 1:24-cv-00128-TNM   Document 10   Filed 02/16/24   Page 22 of 25

ScienceABC

Phys

Che

Biolo

Engi

Matl

Soci
Scie

Vide

Abo
Us



Temperature checks have become an indispensable part of everyone's travel experience. (Photo Credit : VectorMine/Shutterstock)

Using a temperature gun reduces the risk of cross-contamination and spreading disease due to its non-contact approach. Also, the temperature readings are obtained at a much quicker pace than traditional methods. However, a temperature gun should only be used to screen patients, not diagnose them.

The temperature reading displayed by an IR thermometer is affected by a variety of factors. This includes how and where the IR thermometer is used and its calibration. Important points to consider include positioning of the laser on the forehead, ensuring the body and forehead temperature hasn't been influenced due to excessive clothing or use of

Science**ABC**   Q Phys

Che

not take readings in direct sunlight).

While the accuracy of temperature guns has always been up for debate given the current scenario (the volume of temperature measurements, the number of bodies to be screened, and the high risk of contamination), the use of a slightly inaccurate but non-invasive technology like a temperature gun over more accurate but invasive methods seems essential!

Biolo

Engi

Math

▸ References (click to expand)

Soci
Scie

Tags: Black body, Electromagnetic radiation, Infrared, Physics, Temperature

Vide

Abou
Us

**About the Author**

Piyush is a mechanical engineer from Mumbai (India) who runs as much as his machines. He'll always be up to talk about comics, movies, and music. Will meet you annually at the comic-con and daily at the gym.

**More from this author**.

# Related Posts

*Science* **ABC**

🔍

Phys
Che
Biolo
Engi
Math
Soci
Scie
Vide
Abor
Us



Used in Thermometers?

📅 June 24, 2018    🏷️

Chemistry

Temperature And How Is It Measured?

📅 August 4, 2019    🏷️

Physics

Counter And How Does It Work?

📅 October 7, 2017    🏷️

Physics

Is There A Limit To How Hot An Object Can Get?

📅 January 18, 2017    🏷️

Physics

If Heat Cannot Travel Through A Vacuum, Why Does The Sun Feel Hot?

📅 October 11, 2016    🏷️

Physics

What Is The Temperature In Outer Space?

📅 January 7, 2016    🏷️

Astrophysics

## Related Videos



How Does Temperature Regulation In An Electric Iron Work?



Molar Heat Capacity: Definition, Formula, Equation Explained in Simple



How Igloos Turn Snow into Toasty Havens

# Science ABC

Phys
Che
Biolc
Engi
Matt
Soci
Scie
Vide
Abo
Us

📅 January 10, 2024







What is the Heisenberg Uncertainty Principle: Explained in Simple Words

📅 November 25, 2020

How Do We Know Temperatures from Thousands of Years Ago?

📅 October 9, 2023

Feels Like Temperature: What It Really Means and How It's Calculated

📅 November 10, 2023

ScienceABC participates in the Amazon Associates Program, affiliate advertising program designed to provide a means for sites to earn commissions by linking to Amazon. This means that whenever you buy a product on Amazon from a link on here, we get a small percentage of its price. That helps support ScienceABC with some money to maintain the site. Amazon and the Amazon logo are trademarks of Amazon.com, Inc. or its affiliates.

Science ABC Copyright © 2024.

About Us | Publishing Policy | Privacy Policy | Terms of Use | Contact Us

2/16/2024, 7:34 PM